## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON

**CIVIL ACTION NO. 05-101-DLB**

**ELIZABETH A. PATTERSON**                                                    **PLAINTIFFS**

**vs.**                          **MEMORANDUM OPINION & ORDER**

**CARROLL COUNTY**
**DETENTION CENTER, ET AL.**                                              **DEFENDANTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### I.   INTRODUCTION

Plaintiffs, Elizabeth A. Patterson ("Patterson"), personally and as Administrator of the Estate of the Unborn Child of Patterson,[1] bring this § 1983 and wrongful death action against Defendants, Carroll County Detention Center, Carroll County Fiscal Court, Jailer Michael Humphrey in his capacity as jailer of the Carroll County Detention Center, and Unknown Personnel of the Carroll County Detention Center, individually and in their capacities as staff and/or employees, alleging various constitutional and state law claims.

This matter is presently before the Court upon Defendants' Motion for Summary Judgment (Doc. # 24).  Plaintiffs have filed a Response (Doc. # 30), to which Defendants filed a Reply (Doc. # 33).  Oral argument was held on the motion on December 14, 2006.  Therefore, the motion is ripe for the Court's review.

### II.   FACTUAL BACKGROUND

---

[1] The claims of previously-named Plaintiff Jeremy Olds, in his personal capacity as Husband of Elizabeth A. Patterson and natural father of Unborn Child, were dismissed by Order of this Court for failure to prosecute (Doc. # 40).

On May 28, 2004, Patterson was booked into the Carroll County Detention Center ("CCDC"), in Carrollton, Kentucky, to serve her felony sentence for driving under the influence of alcohol.  During the intake process, Patterson was asked various medically-related questions and informed the CCDC that she was pregnant.  Patterson indicated that she was not having any problems with the pregnancy and the only medications she was taking were prenatal vitamins, the sleep aid Ambien, and Buspar, which was prescribed by her OB/BYN for anxiety.  Although records from her OB/GYN, Dr. Tony Dotson, placed her gestational period at approximately 11.4 weeks on May 25, 2004, Patterson informed CCDC that she was 4 months pregnant upon her intake into the jail.[2]

From May 28, 2004 until the date of the alleged incident, July 6, 2004, the record does not reflect any pregnancy-related medical problems.  In fact, Patterson stated in her deposition that she that she had no complications and did not make any medical requests – i.e., ask to see a doctor – during that period.  Patterson also continued taking her medications, including the prenatal vitamins, which were administered to her by the CCDC during this same period.  However, Patterson made verbal requests for milk, snacks, and/or additional vitamins in order to increase her intake of calcium and protein.  These requests were not fulfilled by the CCDC.  Additionally, Patterson maintains that during the large majority of the relevant time period, she was forced to sleep on the concrete floor of the jail,

---

[2] This inconsistency remains a minor point of contention between the parties.  Although medical records indicate that Patterson was anywhere from 17 to 19 weeks pregnant at the time of the incident on July 6, 2004, Patterson's statement to the CCDC that she was four months pregnant in late May would place her gestational period at somewhere beyond 20 weeks.  However, the record does not contain any evidence, or reference to any records, that would be able to establish a gestational period different than the 17 to 19 week estimates, which were allegedly based on the information given by Patterson regarding her last menstrual cycle as well as prior examinations of Patterson during her pregnancy by her OB/GYN, Dr. Dotson.

which she believes may have played some role in the eventual complications with her baby, although she was provided a mattress (or a "thin mat" in her words) identical to those slept on by inmates housed in metal bunks.

During the evening of July 6, 2004, between approximately 11:00 p.m. and midnight, Patterson began having severe cramping relating to her pregnancy.[3]  Patterson, having been pregnant in the past (including one miscarriage), informed the deputy jailers that she was in an unusually great amount of pain.  The actual accounts of what was said to Patterson in response differ, but it is undisputed that one guard in particular, "Ms. Janice," laughed off Patterson's concerns because she believed that the cramps were merely a symptom of the pregnancy.[4]  Subsequently, Patterson laid down in an attempt to calm herself, after which time she took a warm shower that helped mitigate the cramping, but only to a degree.  After Patterson returned to her cell, which contained around 10 inmates, the cramping pains continued and began to get worse.  Patterson attempted to pace the cell to further calm herself, although she began to get worried that the cramping was the beginning of labor pains.

At approximately 5:30 a.m. that same morining, Patterson's water broke, at which time several inmates in the cell began to alert the jail staff that there was an emergency.

---

[3] At oral argument, the actual time of Patterson's initial cramping was a point of contention. The record is not definitive in this respect.  However, because Plaintiffs' pleadings repeatedly suggest, and Patterson's deposition testimony corroborates, that the cramping began in the very late hours of July 6, Plaintiffs' version of events is credited for purposes of adjudicating Defendants' summary judgment motion, as all facts are to be viewed in the light most favorable to Plaintiffs.

[4] Plaintiffs' Response indicates that the guard stated, in response to Patterson's painful complaints: "That's just tough shit.  I've (referring to the female deputy guard herself) had pregnancies and gone through lots of cramps."  However, in her deposition, Patterson recalls the guard's comments as: "[T]hey're fucking cramps.  People have cramps when they're pregnant."

The staff immediately retrieved towels for Patterson to place between her legs to clean up the amniotic fluid and to prevent the further loss of blood. Patterson was removed from her cell and taken to the booking area where she witnessed guards in a panicked frenzy trying to decide how they should proceed. CCDC staff was attempting to determine what hospital they were authorized to transport Patterson to, and they did not call an ambulance or a doctor. After being told that she could sit down while the staff sorted things out, Patterson requested to call her emergency contact and her request was denied at that time.

After several more minutes had passed, the staff made the decision to transport Patterson to a hospital in LaGrange, Kentucky, approximately 30 miles away, even though there was a hospital much closer in Carroll County. Before leaving the CCDC, Patterson again requested to call her family to inform them of the situation. Patterson's request was granted and she proceeded to call her family and explained that she was being taken to LaGrange; her family indicated that they would meet her there. CCDC staff subsequently placed Patterson into the "paddy wagon" for transport to the hospital. On the way to LaGrange, "Ms. Janice," the deputy jailer that had originally discounted Patterson's complaints of unusual cramping pains, proceeded to apologize numerous times to Patterson, asking: "Well, why didn't you tell me you were serious?"

When they arrived at the hospital, "Ms. Janice" escorted Patterson to the emergency room. Patterson proceeded into labor and miscarried her child. The medical records indicate that the baby was "friable and gray." According to the OB/GYN on duty at the emergency room that morning, Dr. Darrick McDanald, a friable and gray fetus indicates that it was probably dead inside of Patterson's womb for days or even weeks prior. Dr. McDanald stated that it is not unusual for a woman to be carrying a dead fetus without

symptoms of the death and that the time frame for actual labor in such circumstances can vary widely.  After the miscarriage, Patterson continued losing a great deal of blood while doctors waited for her to deliver the afterbirth.  Despite the aggregate amount of blood loss over the course of the night and early morning, Patterson never lost consciousness.

### III.   ANALYSIS

#### A.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once the movant has met this initial burden, the non-movant cannot rest on its pleadings, but must show that there is a genuine issue for trial.  *See id.* at 324.  A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party."  *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001).  If a reasonable jury could not return a verdict for the nonmoving party on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant.  *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

#### B.   Federal Claims

The events which occurred the night of July 6th and into the early morning of July 7th, 2004, as well as the general conditions of Patterson's incarceration at the CCDC, are

largely undisputed.  The dispositive point of contention, therefore, is whether the actions or omissions of the CCDC with respect to the events surrounding Patterson's premature delivery and her general treatment while incarcerated rise to the level of a constitutional violation or, in the summary judgment context, create a genuine issue of fact for trial.  The constitutional standards applied to the relevant conduct are, of course, a matter of law; but the question of whether the relevant conduct equates to such standards is a factual inquiry that is reserved for the domain of the fact finder unless, however, a reasonable jury could not find in favor of the nonmoving party.  *See Anderson*, 477 U.S. at 248.

Plaintiffs, in Count One of their Complaint, allege a cause of action for constitutional violations pursuant to 42 U.S.C. § 1983.  Courts are authorized under § 1983 to "redress violations of 'rights, privileges, or immunities secured by the Constitution and [federal] laws' that occur under color of state law."  *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) (quoting 42 U.S.C. § 1983).  This provision "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere."  *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001).  In the case *sub judice*, Plaintiffs assert that Defendants, acting under color of state law, violated Patterson's constitutional right to be free from "cruel and unusual punishment" as guaranteed by the Eighth Amendment to the United States Constitution.  U.S. Const. amend VIII.

Eighth Amendment claims by prisoners based on specific conduct, rather than on the penalty formally imposed for the crime of conviction, necessitate inquiry into the state of mind of the acting officials.  *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991).  "Where prison [or jail] officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual

punishment in violation of the Eighth Amendment." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Therefore, in order to state a cognizable claim under the Eighth Amendment in this case, as authorized under 42 U.S.C. § 1983 and applicable to the states via the Fourteenth Amendment, Plaintiffs must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

### 1.    The Premature Delivery

Given that the "seriousness" of Patterson's condition on the night in question is not genuinely in dispute, as it is clear the situation was of some gravity *once Patterson's water broke*,[5] the remaining inquiry concerns the state of mind of the relevant actors that night, including at what point the CCDC became aware of the serious nature of Patterson's predicament. In determining the existence of deliberate indifference, the general inquiry asks both: "(1) if the officials acted with a sufficiently culpable state of mind and (2) whether the alleged wrongdoing was 'objectively harmful enough to establish a constitutional

---

[5] Plaintiffs attempt to define the context of "serious" in terms of Patterson's condition generally, referring only to her pregnancy as the serious condition requiring treatment. This untenable application of the legal standard is an effort by Plaintiffs to suggest that because Patterson was pregnant, she was in a permanently serious medical condition and, therefore, once the guard ignored her painful calls of cramping, she was acting with deliberate indifference. However, the general condition of being pregnant does not necessarily constitute a serious medical need at any given moment in time during incarceration absent a development that "must require immediate attention." *Smith v. Franklin County*, 227 F. Supp. 2d 667, 677 n.10 (E.D. Ky. 2002) (citing *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992)); *see also Coleman v. Rahija*, 114 F.3d 778, 784-85 (8th Cir. 1997). This is especially true in Patterson's case where she admitted that there were no prior complications and that she did not previously request medical attention for her pregnancy at anytime while incarcerated at the CCDC. Simply put, the serious medical need only arose in this case when Patterson entered premature labor as manifested by her water breaking because it was only then that "a lay person would easily recognize the necessity for a doctor's treatment." *Smith*, 227 F. Supp. 2d at 677 n.10 (quoting *Gaudreault v. Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

violation.'" *Smith v. Franklin County*, 227 F. Supp. 2d 667, 677 (E.D. Ky. 2002) (quoting *Hudson v. McMillian*, 503 U.S. 1, 2 (1992). Accordingly, while the objective component of the deliberate indifference standard looks to "contemporary standards of decency," the subjective component requires that the actor "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and [she] must also draw the inference." *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992); *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994).

For present purposes, to survive summary judgment, Plaintiffs must demonstrate that the allegation of deliberate indifference is supported by the record construed in Patterson's favor to such a degree that a genuine issue of material fact is created for a jury to decide. In that regard, no reasonable jury could find that a guard who brushes off an inmate – no matter how callously – that is four to five months pregnant and begins to exhibit cramping, but had not experienced *any* prior complications with her pregnancy,[6] was "deliberately indifferent to a serious medical need." The knowledge that Patterson was indeed pregnant, absent any continuing complications, did not place the CCDC on notice that Patterson had a serious medical condition requiring "immediate attention," which might, in turn, warrant more robust action be taken upon the mere signs of cramping. *See Caldwell*, 968 F.2d at 602. However, when the condition became manifestly serious (i.e., when Patterson's water broke), the staff acted immediately and, according to Patterson,

---

[6] At oral argument, Plaintiffs' counsel confirmed that Patterson did not have any problems with her pregnancy prior to the night in question and that the CCDC was never made aware of any health concerns surrounding Patterson's pregnancy, other than the fact that she was indeed pregnant.

went into a frenzy with three or four guards "going in different directions" because "they

didn't know what to do."

In their recitation of facts, Plaintiffs' own characterization of the state of mind of the

various actors could not reasonably be interpreted as knowledge of, and therefore

deliberate indifference based on their actions in response to, a serious medical need:

> [T]he deputy jailers of the Carroll County Detention Center did absolutely
> nothing for the Plaintiff other than tell her how sorry they were and
> apologizing for them not taking her *seriously* the night before when cramps
> began.  It was on the way to the hospital that the same guard who had
> previously said "that's tough shit referring to her abdominal cramps and the
> pain she had been in" [*sic*] that began to break down apologizing time and
> time again in an effort to try and comfort the Plaintiff knowing what she had
> done was terribly, terribly wrong and *insensitive*.

(Doc. # 30, p. 5) (emphasis added).  Additionally, and notably, Patterson recalls in her

deposition that when she was being transported to the hospital, the guard that had

originally discounted Patterson's cramping pains, "Ms. Janice," asked Patterson: "Well, why

didn't you tell me you were *serious*?"  (Patterson Depo., p. 75) (emphasis added).  This

type of statement, coupled with the efforts of others at the CCDC that night, illustrate that

the staff's conduct toward Patterson was never wanton or deliberate once the CCDC was

aware that a "substantial risk of harm" existed.  *Farmer*, 511 U.S. at 837-38.

Plaintiffs also suggest that the delay in treatment, due in large part to the locating

of a contracting hospital and the length of the drive to that hospital, resulted in the wrongful

death of the Patterson's unborn child.  Because of the inevitable discretion that exists in the

administration of medical care by the jail staff, "[a]llegations of denial of medical treatment

based on a delay in treatment are to be gauged by examining the effect of the delay in

treatment, which is to say that an 'inmate who complains that delay in medical treatment

rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Smith*, 227 F. Supp. 2d at 677 (quoting *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

Accordingly, to sustain allegations of wrongful death based on delay of medical treatment, Plaintiffs must demonstrate that the conduct of the CCDC at least played a role in the death. However, the nonviability of the fetus precludes any wrongful death claim on behalf of the unborn child, as discussed *infra*, and the record does not otherwise construct any causal relationship between the alleged unconstitutional delay and the death of the fetus. Even without reference to viability and the lack of medical evidence establishing causation, however, Plaintiffs must still satisfy the subjective component of the "deliberate indifference" standard, that is the CCDC must have exhibited a "sufficiently culpable state of mind" in allegedly delaying treatment. *Farmer*, 511 U.S. at 834.

To that effect, there is nothing in the record evincing a deliberate delay in treatment or wanton conduct toward Patterson once the CCDC was placed on notice as to the seriousness of the medical need. To the contrary, Patterson's deposition demonstrates that the staff was making every attempt to transport Patterson to a hospital, even though their intentions may have been somewhat misplaced: "[The jail officer] was standing behind the booking desk and I heard [him] say, 'I don't know what to do. I don't know where to take her. We don't have a contract.' He said, 'I called over to Indiana and we don't have a contract with them. They don't want her. I don't know where to take her. I don't know what to do with her.'" (Patterson Depo., p. 71).

Whether or not the actions of the CCDC that night were actionable under various alternative state law legal theories, it is clear that the conduct falls well short of a constitutional violation under the Eighth Amendment.  The CCDC was initially unaware of the seriousness of Patterson's condition that night and there is no evidence in the record which suggests that the staff of the CCDC acted with deliberate indifference once the serious nature of the circumstances became apparent.  To the contrary, the record as recited by Plaintiffs illustrates that the CCDC treated Patterson's medical needs with great concern and, although the efforts may have been less than expeditious in hindsight, the night as recalled by Patterson in her deposition does not highlight any indifference by any member of the CCDC staff upon the realization of Patterson's worsening condition.

### 2.        "Totality of the Circumstances"

Plaintiffs allege in the alternative that the totality of Patterson's treatment by the CCDC while incarcerated constitutes a violation of the Eighth Amendment, taking into account Patterson's unique needs as a pregnant woman in jail.  In addressing "totality" claims, courts are required to consider all of the jail's "conditions and circumstances, rather than isolated conditions and events."  *Walker v. Mintzes*, 771 F.2d 920, 925 (6th Cir. 1985). Accordingly, "[i]n certain extreme circumstances the totality itself may amount to an eighth amendment violation, but there still must exist a specific condition on which to base the eighth amendment claim."  *Id*.  In other words, to sustain a constitutional violation, there must still exist a specific condition that "considered alone or in combination [with other conditions]" amounts to a "*deprivation of 'life's necessities*.'"  *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) (emphasis added).

-11-

Specifically, in her deposition, a seemingly genuine Patterson enumerates two primary ways in which she believes she was mistreated by the CCDC during her incarceration – prior to the events of July 6th and 7th – that may have somehow factored in to the eventual problems with her pregnancy.  First, she was forced to sleep on the floor of her cell because of overcrowding, although the mattress, or "thin mat," she slept on was the same mat provided to inmates housed in metal bunks.  When asked if she believed her sleeping conditions in any way contributed to her miscarriage, Patterson responded: "I'm not going to say it didn't."  To the contrary, however, Patterson admitted that she had no complications with her pregnancy, or her health generally, while incarcerated and never made a request to see a doctor.[7]  Also, Dr. McDanald concluded that it was "unlikely" that the bed issue contributed to "the preterm labor and birth" and the record does not contain any evidence, other than Patterson's subjective complaints, that sleeping on a mat on the floor rather than a bunk had any effect on Patterson's health.

Second, despite three meals a day and the continued administration of her prescribed pregnancy-related medication and vitamins by the CCDC during her incarceration, Patterson didn't "think it was too much to ask for milk with [her] meals to provide calcium and vitamins or an extra snack at night, like peanut butter, that's high in protein . . . ."  Nevertheless, Patterson admitted in her deposition, and the record evinces, that she spent relatively large amounts of money on numerous "canteen" purchases of cigarettes while she was pregnant in jail, but did not purchase milk, peanut butter, additional vitamins, etc. (though it is unclear what items were actually available for

---

[7] Patterson did register verbal complaints regarding the sleeping conditions and was eventually assigned to a bunk only a few days before her premature delivery.

purchase).[8]  Additionally, in response to the question of whether the alleged nutritional deficiencies contributed to Patterson's miscarriage, Dr. McDanald indicated that he believed they were not a factor and that Patterson appeared healthy based on her pregnancy weight.

Furthermore, even if Patterson's ongoing pregnancy was considered a serious medical condition, the continued administration of her medicine along with the general nutrition provided to inmates, which Plaintiffs do not question, cannot be reasonably construed as an environment deliberately indifferent to Patterson's pregnancy-related needs.  The mere fact that Patterson was forced to sleep on the floor with a mat, and that the CCDC refused to provide Patterson extra milk or snacks, which she could have purchased herself in lieu of cigarettes, does not demonstrate actionable conduct – i.e., "a deprivation of life's necessities" – upon which a reasonable jury could find a constitutional violation.  *Walker*, 771 F.2d at 925 (quoting *Rhodes*, 452 U.S. at 347).

In sum, the events surrounding Patterson's premature delivery and general incarceration, as portrayed by Plaintiffs, do not rise to the level of a constitutional violation. The conditions that Patterson faced at the CCDC were well within constitutional bounds, and the alleged actions and omissions of the CCDC on the night of Patterson's unfortunate miscarriage clearly fail to demonstrate deliberate indifference to a serious medical need or condition.  Accordingly, based on the undisputed facts construed in the light most favorable to Plaintiffs, there do not exist any genuine issues for trial as to the constitutional claims

---

[8] However, the "canteen" receipts do show that Patterson purchased peanut butter (Reese's) cups on one occasion.

pursuant to 42 U.S.C. § 1983.   Accordingly, Defendants are entitled to a summary judgment on Plaintiffs' federal constitutional claims.

### C.    Wrongful Death Claim

Plaintiffs' federal claims for constitutional violations pursuant 42 U.S.C. § 1983 allege that said violations resulted in the wrongful death of the unborn child, thereby directly implicating the wrongful death claim.   Under Kentucky law, a wrongful death action on behalf of an unborn child cannot be sustained unless the fetus was viable.   *See Commonwealth v. Morris*, 142 S.W.3d 654 (Ky. 2004); *Mitchell v. Couch*, 285 S.W.2d 901 (Ky. 1955).  The Kentucky Supreme Court, interpreting both section 241 of the Kentucky Constitution and K.R.S. § 411.130, the wrongful death statute, has held that viability is the threshold point at which time a civil right is afforded under law:

> Viability was recognized in *Roe v. Wade* . . . as the 'compelling point' at which the 'the fetus then presumably has the capability of meaningful life outside the mother's womb,' and the earliest time at which a state may proscribe consensual abortions.  It is also the point at which the killing of an unborn child gives rise to a civil cause of action for wrongful death on behalf of the unborn child's estate.

*Morris*, 142 S.W.3d at 660.

In *Mitchell v. Couch*, a case of first impression, the Kentucky Supreme Court addressed the question of viability for wrongful death actions involving negligence:

> In the case at bar this Court has concerned itself with the inquiry, generally speaking, as to whether a prenatal injury arising out of a negligent act affords a basis for an action for damages in behalf of the personal representative of the child, if the infant's death flows directly therefrom.  In this connection, we conclude that when a pregnant woman is injured through negligence and the child, if it be a viable infant within the definition recited above, suffers death as a consequence, a right of recovery exists to the personal representative, provided the causal relation between the negligence and the damage to the child be established by competent evidence.

285 S.W.2d at 906.  Accordingly, Plaintiffs' cause of action for wrongful death can only be maintained if evidence is presented to create a genuine issue for trial as to the viability of the fetus, as well as the causal connection between Defendants' conduct and the death of the fetus.

### 1.    Objective Viability of Fetus

Because the point of viability is different for every fetus, the United States Supreme Court has held that the objective viability of every fetus cannot be determined solely by reference to a specific point in gestation.  *See Colautti v. Franklin*, 439 U.S. 379, 388 (1979).  Nevertheless, experience and the ever-advancing field of medicine does permit a general consensus as to the average gestational period of viability:

> It should be pointed out that there is a definite medical distinction between the term "embryo" and the phrase "viable fetus."  The embryo is the fetus in its earliest stages of development, but the expression "viable fetus" means the child has reached such a state of development that it can presently live outside the female body as well as within it.  A fetus generally becomes a viable child between the sixth and seventh month of its existence, although there are instances of younger infants being born and surviving.

*Morris*, 142 S.W.2d at 660 (quoting *Mitchell*, 285 S.W.2d at 905).

In other words, medical understanding as to the development of the fetus and the typical time frame for viability, coupled with an individualized understanding in the case of a particular fetus, can produce an opinion as to viability.  To that effect, Dr. McDanald, during his deposition, opined that the fetus in this case was nonviable:

> Q:    Doctor, based upon your education, training and experience do you have an opinion as to the viability of a fetus at the gestational age of 17 weeks?
> A:    Yes.
> Q:    And what is your opinion?
> A:    It's nonviable.

-15-

Q:    The definition under the law in Kentucky of viability is that the fetus means the child [*sic*] has reached such a state of the development that it can presently live outside the female body.  In your opinion, based upon your education, training and experience, so that we don't mix up whatever viability may mean in medical terms as opposed to this legal definition, do you have an opinion as to the viability of the fetus at 17 weeks?

A:    Yes.

Q:    What is your opinion?

A:    Nonviable.

Q:    As I indicated in the hospital record there were varying accounts of the gestational age of the fetus, some as 18 weeks.  The highest reported date that I saw in the record was 19 weeks.  Do you have an opinion as to the viability based upon the legal definition I read to you of the fetus at 19 weeks?

A:    Yes.

Q:    What is your opinion?

A:    Nonviable.

Q:    Doctor, in the medical literature is the viability, the opinion that you have rendered, are those well accepted in the medical and scientific community?
      (Mr. Nageleisen: Ojection.)

A:    Yes, they are.

(McDanald Depo., pp. 18-20).

Plaintiffs, in support of their contention that the determination of fetus viability is an issue for trial, cite to an unpublished case out of the Sixth Circuit applying Kentucky law. *See Franzen v. CSX Transp., Inc.*, No. , 1992 U.S. App. LEXIS 33673.  In *Franzen*, the Sixth Circuit reversed a district court's grant of summary judgment, holding that the district court's determination that there wasn't an issue for trial as to the viability of the fetus was in error because the plaintiff had presented "specific facts" to create a triable issue. Plaintiffs, here, cite to *Franzen* for the proposition that the viability of a fetus is always a question of fact for trial.  However, Plaintiffs' reliance is misplaced.  Unlike the case at bar, the plaintiff in *Franzen* presented medical testimony to rebut the evidence of nonviability, and the Sixth Circuit reversed on that point alone: "The affidavit of Dr. Schmidt flatly

-16-

contradicts that of Dr. Greene. . . . Thus, the question of the infant's viability presented a genuine issue of material fact and was thus properly for the jury." *Id.* at *9-10.

### 2.   Subjective Viability of Fetus

Even if Plaintiffs could establish that the fetus wasn't necessarily nonviable based on its period of gestation – presumably through the presentation of some evidence at trial that is not now in the record –  the record still demonstrates that the fetus most likely died days or even weeks prior to Patterson's premature delivery, which goes to the issues of both viability and causation.  When asked about the death of the fetus in his deposition, Dr. McDanald opined that the fetus had died sometime prior to Patterson's premature delivery on the morning of July 7, 2004:

> Q:   - - Do you have an opinion as to whether or not the fetus, the day that
>       it was delivered on July the 7th, based upon the description given by
>       the pathologist was alive on July 7th?
> A:   It's unlikely that it was alive that day.

(McDanald Depo., p. 21).

Even in response to *Plaintiffs'* counsel later in his deposition, Dr. McDanald elaborated on his opinion that the fetus had likely died at least days before the delivery, if not weeks, explaining that it is not uncommon in miscarriage scenarios for the fetus to die without the mother's knowledge and for the actual delivery to occur some indeterminate time after the death:

> Q:   Now, the fact that the pathology report indicates the fetus is friable,
>       which is able to be broken, and gray, what do they mean by gray?
> A:   Just the color of the specimen.  At - - and again, the gross description.
>       He or she, I guess she is describing what she sees when she just
>       looks at the specimen before the microscopic analysis occurs.  So
>       she's describing the color of the fetus.
> Q:   And once the pathologist began the microscopic analysis, would that
>       tell us more?

A:    About the color?

Q:    About the color and what may have happened, or how this baby may have died, anything like that.

A:    Possibly.

Q:    She would be - - the pathologist in this case would be the best person to ask that?

A:    Yes.

Q:    Now, the fact that this fetus was friable and gray, can we - - can you as you sit here today state a hundred percent as to why that fetus may have been that way?

                                        * * * * *

Q:    Let me rephrase the question.  Can you within a reasonable degree of medical probability as an OB/GYN say one hundred percent - -

                                        * * * * *

Q:    - - or say or give a reason, a specific reason as to why this fetus may have been described in that fashon?

A:    Yes.

Q:    All right.  Go ahead.

A:    It's my opinion that the fetus was likely dead for a number of days or weeks prior to evaluation by the pathologist.

Q:    If the fetus were, in fact, dead and still contained within the mother, what types of signs or how long would it take for there to be signs that the fetus was no longer living?

A:    It's very variable.  I mean, signs - - you know, certainly the day after the death it's detectable.  If you ran a test on a person every day, obviously you would detect that the next day.

Q:    So am I understanding that it would be possible that a woman could be carrying a dead fetus for quite some time without anybody knowing?

A:    Absolutely, yes.

Q:    And once a fetus dies, is it fair to state that just because a fetus has passed away that there is no certain time frame for the mother to go into any type of labor to eject that fetus from her body?

A:    Correct.  That's a variable time period.

Q:    So it could be a long time?

A:    Correct.

(McDanald Depo., pp. 53-56).

        If the fetus had indeed died well before the night of Patterson's premature delivery,

to which Plaintiffs offer no contradictory evidence, this would not only suggest that the fetus

was nonviable, but would also be strong evidence that the alleged actions or omissions on

the part of the CCDC that night or earlier did not play any part in the death of the fetus.

Furthermore, despite Plaintiffs' contention that action could have been taken by CCDC the night of Patterson's premature delivery that may have prevented the miscarriage, namely to have a doctor administer medication that prevents or reduces the possibility of labor, Dr. McDanald believed that there was nothing the CCDC could have, or should have, done to prevent the premature delivery:

> Q:    Once contractions start in a woman who is in her first or second trimester, how do you as an OB/GYN try and stop them?
> A:    Well, we have some drugs but none of which have been proven to ever delay birth or preterm delivery.
> * * * * *
> Q:    And in an emergency situation where you see this is coming, is that what you do, typical protocol, would be to give them a shot to try and stop it?
> A:    Not at her gestational age.  And again, they don't work.
> Q:    What would you do at her gestational age to try and stop her from proceeding on into labor?
> A:    Nothing.
> Q:    You would just let it happen?
> A:    Yes.
> Q:    And if that meant her having a premature baby, that would be as a result of just letting it happen?
> A:    Correct.

(McDanald Depo., pp. 95-96).

Dr. McDanald further opined that the proper of course of action was simply to let nature take its course because of the potential health risks to the mother:

> Q:    At what point in a woman's pregnancy would you not let that happen?
> A:    First of all for a woman to have labor at that gestational age, if I don't - - there is likely something wrong, and that is why we allow it to proceed.
> Q:    The cramping?
> A:    Well, no.  Let's say the labor.  I mean, I'm saying you wouldn't stop it even if it meant the baby was coming.  Because likely there was something there I don't know about, because that's not normal and likely to happen in a normal pregnancy.  Therefore, I assume there is

> infection or something that needs to be treated and relieved.  Once you hit about 24 weeks or viability, then, you know, we obviously are a bit more aggressive in certain instances. . . .  So it's very patient dependent.  I mean, there are some - - we can't find a reason not to stop them, then, of course, we are aggressive after 24 weeks.  If there are certain conditions that exist where we have to let them go and we don't try to stop them, because it's more harmful to stay pregnant than it is to going [*sic*] ahead and deliver even though they're premature.

(McDanald Depo., pp. 96-97).

In an attempt to manufacture an issue for trial, Plaintiffs suggest that the wrongful death claim must survive summary judgment because the facts are disputed "as evidenced by the conflicting testimony of [Patterson] and Dr. McDanald . . . ."  Plaintiffs further contend that, "[s]imply stated, the witnesses that are testifying or have testified are saying different versions of facts which are contrary to each other thus creating 'material questions of fact' which is why we have jury trials in the first place."  Despite Plaintiffs' assertions otherwise, Patterson's testimony does not even speak to the issue of, and in no way contradicts, Dr. McDanald's testimony as to the viability of the fetus.

Once Defendants met their initial burden of demonstrating that summary judgment is appropriate, Plaintiffs cannot rest on their pleadings alone, but must instead establish with "specific facts" that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248*; see also* Fed.R.Civ.P. 56(c).  Plaintiffs have failed to do so.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' wrongful death claim for failure to establish a genuine issue of material fact on the issue of viability.

**D.     Residual State Law Claims**

The granting of summary judgment and consequent dismissal of the federal § 1983 claims in Count One of Plaintiffs' Complaint – as well as the related wrongful death claim in Count Two – renders this Court's jurisdiction over the remaining state law claims found in Counts Three through Nine (including the state constitutional claims in Count I) solely supplemental under 28 U.S.C. § 1367.

Pursuant to § 1367(c)(3), where a district court "has dismissed all claims over which it has original jurisdiction," the court "may decline to exercise supplemental jurisdiction." 28 U.S.C. § 1367(c)(3).  In the Sixth Circuit, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment."  *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims").  Accordingly, Plaintiffs' federal claims having now been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in this matter.

## IV.     CONCLUSION

This is, of course, a difficult case.  Ms. Patterson's unfortunate loss should not be taken lightly simply because the unborn child was at an early gestational age, regardless of viability.  The Court recognizes the pain that results from losing a child, at any stage of development, is considerable.  Nevertheless, under Kentucky law, a claim for the wrongful death of an unborn child is only cognizable once viability is established.  The record does not support such a claim in this case.  Furthermore, to establish liability for a federal

constitutional violation under the Eighth Amendment, Plaintiffs must demonstrate that Defendants acted with "deliberate indifference to a serious medical need." As it is clear that Defendants' conduct did not rise to the level of deliberate indifference to the serious needs of Ms. Patterson, Plaintiffs' Eighth Amendment claim fails as a matter of law.

In accordance with the foregoing analysis, and in the absence of any genuine issues of material fact, summary judgment is appropriate and Defendants must prevail as a matter of law as to the federal § 1983 and wrongful death claims alleged in Counts One and Two of Plaintiffs' Complaint, respectively. The remaining pendent state law claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).[9]

For the reasons set forth above, **IT IS ORDERED** that:

(1)     Defendant's Motion for Summary Judgment (Doc. # 24) be, and hereby is, **GRANTED IN PART as to Count One (federal claims) and Count Two** ;

(2)     Count One (federal claims only) and Count Two of Plaintiffs' Complaint be, and hereby are, **DISMISSED WITH PREJUDICE**;

(3)     Counts Three through Nine of Plaintiffs' Complaint, including any state law claims found in Count One, be, and hereby are, **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3);

(4)     All Counts having been dismissed, Plaintiffs' Complaint be, and hereby is, **STRICKEN** from the active docket of this Court;

(5)     A Judgment in favor of Defendants will be entered concurrently herewith.

---

[9] Section 1367 further dictates that statutes of limitation for state law claims attached via supplemental jurisdiction to federal claims in federal court are tolled during the pendency of the federal action, and for 30 days thereafter in the case of dismissal. *See* 28 U.S.C. § 1367(d).

This 20th day of December, 2006.



Signed By:

*David L. Bunning*   *DB*

**United States District Judge**

G:\DATA\Opinions\2-05-101 Patterson (MSJ MOO).wpd